# CHARLESTON.

EGERTON v. FLESHER *et al.*

Submitted May 5, 1915. Decided June 15, 1915.

1. FERRIES—*Application to Establish—Public Need—Discretion.*
    Upon an application to a county court to establish a third ferry, where there are already two ferries serving the same public, the imperative public need for such additional ferry, and not the private ends of the promoters, or their selfish desires to absorb the business of one or both of the other ferries, should control the sound discretion of the court in refusing or granting such franchise. (p. 522).

2. SAME—*Establishment—Discretion—Evidence.*
    Applying this rule, the facts established by the evidence in this case did not warrant the action of the county court in establishing such third ferry. (p. 523).
    (LYNCH, JUDGE, absent.)

Error to Circuit Court, Cabell County.

Action by W. A. Egerton against B. T. Flesher and others. Judgment for plaintiff, and defendants bring error.

*Reversed and rendered.*

*Neal & Strickling* and *Campbell, Brown & Davis,* for plaintiffs in error.

*Williams, Scott & Lovett* and *Geo. S. Wallace,* for defendant in error.

MILLER, JUDGE:

By its judgment of March 11, 1914, complained of, the circuit court of Cabell County, upon an appeal by defendants,

affirmed the final judgment or order of the county court, pronounced on June 12, 1913, establishing on the application of plaintiff a ferry from a point on the Ohio River at or near the foot of Sixteenth Street, in the City of Huntington, West Virginia, to a point nearly opposite on the river bank in Lawrence County, Ohio.

The defendants, B. T. Flesher and Mary A. Flesher, husband and wife, who owned and had operated successfully, since the year 1901, another ferry, below the proposed ferry, and from a point on said river, at or near the foot of Tenth Street, in said city, to a point opposite on the Ohio side and near the mouth of Symmes Creek, were admitted as defendants and resistants to the granting of the proposed franchise; and deeming themselves aggrieved by the adverse judgments of the county court and of the circuit court upon their appeal have brought the case here for review, on writ of error awarded them on their petition assigning error.

The record, very voluminous, shows that at the time of plaintiff's application there were already established and in operation within the corporate limits of said city, besides appellants' ferry at the foot of Tenth Street, a ferry at Central City, and about two miles below their ferry; another above it at the foot of Twenty Sixth Street, and another some three miles still farther up the river and known as the Guyandotte or Proctorville ferry. It is claimed, also, that there are two or three other ferries at other intermediate points, some, if not all of which are operated for carrying passengers only. The evidence also shows a turnpike road paralleling the Ohio River on the Ohio side, and connecting all these ferries.

The testimony also shows that at least sixty per cent. of the patronage of appellants' ferry comes from the Symmes Creek valley; that the people inhabiting that valley are principally engaged in truck farming and fruit raising, and that considerable tobacco is also raised there, and that a large part of these products find an outlet by way of the roads leading up this valley and over the ferries at Tenth and Twenty Sixth Streets, and ready market in the City of Huntington, where there are also cold storage houses. The principal road up the Symmes Creek valley follows the creek, and is called the Eaton turnpike, the general trend thereof being north

and south, but when at a point within about a half a mile from the Ohio River the road forks, one fork going directly to the river, and to a point directly opposite the foot of said Sixteenth Street, the location of the proposed ferry, the other following the course of the creek and with it paralleling the Ohio River in a southwesterly direction and then making a sharp bend in a southeasterly direction and coming to the Ohio River almost opposite appellants' ferry, and a distance of about a mile and a half from the forks of the road. The point at which the first prong of this road reaches the river is about equidistant between appellants' ferry and the ferry at Twenty Sixth Street, and the natural result would be to divide about equally between these two ferries the patronage from the Symmes Creek valley, for the evidence is that the road by way of the creek valley on account of its condition is not much used. Moreover, the evidence shows that besides what patronage the Symmes Creek valley furnishes the Twenty Sixth Street ferry that ferry is patronized, or naturally should be, by the people living on the Greasy Ridge road running up from the Ohio River between Bear Creek and Bent Creek, and which naturally would not go to the appellants' ferry.

With these natural conditions obtaining on both sides of the river and about equally divided between these two ferries, the plaintiff and petitioner proposes to establish and the county court by its judgment, so affirmed by the circuit court, has undertaken to establish a ferry at the foot of Sixteenth Street, and directly opposite the point where the first branch of the road up the Symmes Creek valley intersects the turnpike along the river.

On the trial before the county court the applicant proposed and was permitted to show in evidence what purported to be a contract in writing between the Central Ferry Company, a corporation, owning and operating the Twenty Sixth Street ferry, signed on behalf of this company by W. E. Neal, its president, and by three persons, represented as owning a majority of the stock of the company, as parties of the first part, and the plaintiff or applicant, as party of the second part, and whereby in effect the Central Ferry Company, and the three stockholders named, proposed, that Egerton should

proceed to acquire the franchise for the ferry at Sixteenth Street, transfer it and the land acquired therefor to this corporation, and that in consideration thereof the ferry company should issue additional stock and give Egerton or his assignee the right to subscribe for said issue, or any part thereof, and pay out of said subscription the cost of securing the license or franchise and all permits, leases, etc., incurred by him, and the cost and expense of removing the boat, equipment and tackle, then owned by the Central Ferry Company, from Twenty Sixth Street to said Sixteenth Street, the same to be there operated under the franchise so to be obtained by the said company, and the ferry at Twenty Sixth Street to be thereafter abandoned. Other details of the contract are unimportant in the consideration of this case.

The record shows that the principal object of Egerton in seeking the establishment of the additional ferry at Sixteenth Street was to exploit and develop a tract of land owned by him and associates in Ohio, immediately opposite the foot of Sixteenth Street, and that to this end it was thought necessary, in order to establish a successful ferry, to consolidate with it the Twenty Sixth Street ferry, which the evidence shows had been run at a loss, or at least unsuccessfully, and also as far as possible to absorb the business and patronage which would naturally go to appellants' ferry, and which for many years has been successfully operated and managed, and in the main, so far as the record shows, to the satisfaction of the public generally. There is a question made as to the validity of the alleged contract. The evidence tends to show that there was no meeting of the stockholders authorizing it; but that the three stockholders signing the contract owned a majority of the stock of the ferry company, and had obligated themselves thereby to vote their stock and vote in the directors' meeting so as to accomplish the objects of said contract. Whether said contract be valid or not, on grounds of public policy or otherwise, is a question not necessary to be decided for the purposes of this case.

In the case here, as in all cases of like character, the principal question for determination within the sound, but not arbitrary, discretion of the county court, is the imperative public need for the additional ferry, for if there be no

such need our decisions hold such additional ferry should not be established. The public need therefor, and not the private ends of the promoters, or their selfish desires to absorb the successful and prosperous business of another ferry, should be the guiding star in all such cases. *Ferry Co.* v. *Russell*, 52 W. Va. 356; *Williamson* v. *Hays*, 25 W. Va. 609.

To bring his case within these well established and recognized rules plaintiff undertook the burden of showing, notwithstanding the conditions already described and proven, that appellants were unable, or at least had failed to take care of the public business offered them, and that because of this there was necessity for the proposed ferry. But in this we do not think he has succeeded. The sum of all the evidence of the numerous witnesses examined on this subject is this, that during certain months in the year, when the crops are being harvested and marketed, there has been in the early morning hours a congestion of business at appellants' ferry, delaying patrons in getting over the river at from half an hour to an hour and a half. Some of the witnesses say that they have seen as high as from fifteen to twenty-seven wagons, in the early morning before the ferry started, waiting to get across, but none of the evidence shows that any such condition ever occurred at any other time of the day. This congestion, the evidence shows, was due to the fact that these market people, some of them, would leave their homes as early as eleven o'clock the night before, and reach the ferry at very early hours of the morning, in order to gain some advantage of their competitors, in getting over the river. The evidence shows clearly that appellants' boat was well manned and well equipped; that the boat had a capacity of seven to eight wagons or vehicles, and that a round trip could be made in from ten to fifteen minutes, and that three quarters of an hour or at the outside an hour would then be necessary to put all over the river. Besides, there was the ferry at Twenty Sixth Street, as easily reached by the short branch of the Eaton turnpike as appellants' ferry, to relieve all such congestion. But as noted the evidence tends to show the ferry at Twenty Sixth Street was poorly and unsuccessfully operated from a financial standpoint; that no dividends had ever been paid to the stockholders, and that at the time of the trial

of this case the ferry boat seems to have been beached by the high water, and that the owners were then engaged in trying to get it back into the river.

Assuming that there may have been these slight congestions in the business, and that the public might to some extent be convenienced by another ferry at Sixteenth Street, these are not the only elements to be considered in determining the question of the imperative public need. The public is concerned also in the financial success of the owners and operators of the ferries, for without this they could not long hold out in giving any public service. If one ferry can hold and serve better than two, the public interests would be better subserved by the one, than to divide the business with another, and neither be able because of want of sufficient financial support to serve the public well. We know from this record that the Twenty Sixth Street ferry had been a financial failure, notwithstanding its ability to draw from the Symmes Creek valley, and from the territory east of it not tributary to appellants' ferry.

On the trial appellants exhibited their books and vouchers, in connection with a comprehensive tabulated statement, showing in accurate figures the results of their business, by periods of four years, and for the whole time, from 1901 to 1912, inclusive, and although they offered this testimony, and offered their books and vouchers, they were not questioned upon the subject by plaintiff or his counsel, or otherwise, and there can be no question about the verity of' these statements and the books and papers back of them. These figures show in round numbers an original capital investment of $15,000.00. For the first four years, the gross receipts were, $23,701.45; gross expenses, $15,162.17; net proceeds, $8,539.28, or an annual net income of $2,134.82; for the following four years, the gross receipts were, $32,965.15; gross expenses, $18,695.20; net proceeds, $14,269.95, or an annual income of $3,567.48, and for the last quadrennial, the gross receipts were, $32,-471.09; gross expenses, $24,040.69; net proceeds, $8,430.40, or an annual net income of $2,107.60. It thus appears that during this last quadrennial the gross receipts fell off several hundred dollars, and the gross expenses increased several thousand dollars, and that the net annual income decreased

$1,459.88. These figures show great fluctuation in annual receipts and expenses, and also as compared by quadrennial periods. During some years the expenses were greatly increased by the necessity of docking and repairing the boat.

As already noted, the evidence tends to show, it does show to our satisfaction, that sixty per cent. of appellants' business comes from the Symmes Creek valley, and it is fair to assume, we think, from the evidence, that if the proposed ferry is located and operated successfully, it will at least divide the present patronage of the appellants' ferry. This would take away from it about one third of its entire patronage. Using the figures covering the last quadrennial for illustration, this would reduce the gross receipts to $21,000.00, in round numbers, and assuming that the expenses would remain the same, and we can see no reason why they should be reduced, the result would be a net loss to appellants, in round numbers of $2,000.00, for that period. Appellants undertook, but were not permitted to show in evidence, and plaintiff did not undertake to show, the result of the business of the ferry at Twenty Sixth Street. According to our decisions this was a proper subject of inquiry, on the question of the imperative public need, but in the case at bar we think the error was harmless, because in our view of the case the petitioner has wholly failed to show any imperative public need for the additional ferry. That it might serve well his private ends and needs may be granted; that the public might be to some extent convenienced by the proposed ferry may be assumed, but these are uncontrolling considerations. The imperative public need must furnish the foundation for action, and we find no such public need evidenced by the record. Appellants' ferry is well located with reference to the busines center of the City of Huntington, and the evidence shows that they have made application to the county court for the establishment of night rates, and propose to operate the ferry in the night time so as to relieve the congestion of the early morning hours during the harvest months. Why they have applied for night rates, as they explained, was that the income would be small, and the expenses naturally as great as for operating the ferry in the day time, and their evidence is that at best the night operation will be at a loss to them. Increased population on the

Ohio side of the river was also relied on; but the last census showed an actual decrease of several hundred in the population in Lawrence County, as compared with the last preceding census, and an increase only of four or five hundred in the township immediately opposite the City of Huntington. Alleged increase in agricultural products was also relied on; but neither increased population nor increased products seem to have increased the income at appellants' ferry during the last preceding quadrennial; on the contrary, as we have seen, there was a considerable falling off in the gross receipts as compared with the preceding four years.

Our conclusion from the whole evidence, which we will not undertake to detail, is that the plaintiff and petitioner has wholly failed to show any imperative public need for the proposed ferry, and we are of opinion, upon the principles enunciated in the two cases cited, to reverse the judgment of the circuit court, and to enter here such judgment as we think that court, should have pronounced, reversing the judgment of the county court, and dismissing the application of the plaintiff to establish such proposed ferry, and the judgment here will go accordingly.

*Reversed and rendered.*